UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO OBTAIN LOCATION DATA CONCERNING T-MOBILE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (786) 878-9942 AND ACCESSED THROUGH IMSI 310260458254060 | MJ No. 16-MJ-5212 JGD<br><br>**FILED UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF APPLICATION

I, Stephen P. Dowd, being duly sworn, state the following:

1. I am a U.S. Postal Inspector employed with the U.S. Postal Inspection Service, a Federal law enforcement agency. I have been so employed for approximately 21 years. I have been assigned to narcotics investigations for fourteen years and have participated in numerous narcotics investigations involving the transportation of controlled substances or proceeds/payments through the United States Postal Service during that time. During this time, I have intercepted in excess of 700 Express/Priority Mail parcels which were found to have contained controlled substances or the proceeds from the sales of controlled substances. I have received training by the Drug Enforcement Administration in the investigation of controlled substances. I have received training by the U. S. Postal Inspection Service ("USPIS") in the investigation of controlled substances and proceeds/payments for controlled substances being transported through the United States mails. I have also received training from the Department of Justice in the investigation of money laundering and the structuring of financial transactions to avoid reporting requirements.

2. Over the past approximately thirteen years, I have been involved in Federal and state narcotics investigations which have led to hundreds of arrests for possession, distribution,

and trafficking of controlled substances. I have prepared and executed numerous search warrants. I have seized narcotics, stolen property, evidence of crimes, cyber-crime evidence stored on computers and other digital storage devices as a result of the execution of these warrants. I have been the lead investigator in numerous state and Federal investigations where the U.S. Mail was utilized to transport illegal narcotics.

3. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions. I am also aware that drug traffickers commonly use cellular telephones to communicate and further their drug trafficking activities, and that they keep their cellular telephones with them while conducting drug trafficking activities in order to stay in contact with co-conspirators and otherwise to facilitate their drug trafficking activities. I am also aware that drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers, use multiple cellular phones at the same time, and use prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance.

4. Based on my training and experience, I am aware that narcotics trafficking typically involve the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking

among multiple participants including suppliers, customers, distributors, and money launderers. Within the United States and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles. Consequently, the location of narcotics traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

5. More broadly, based upon my training and experience, I know that tracking drug dealers frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

6. Based on my training and experience, I know that tracking narcotics traffickers often corroborates and verifies other information and investigative leads derived from other investigative techniques including informants, wiretaps, and visual surveillance.

7. I submit this affidavit in support of an Application for an Order, pursuant to Federal Rule of Criminal Procedure 41(e)(2)(C) and Title 18, United States Code, Section 3117, authorizing agents of the U.S. Postal Inspection Service ("USPIS"), the Drug Enforcement Administration ("DEA"), the Internal Revenue Service ("IRS"), the United States Marshal Service ("USMS"), and the Massachusetts State Police ("MSP") (collectively, the "Investigative Agencies"), to ascertain the physical location, including but not limited to E 911 Phase II data (or other precise location information) (the "Requested Information"), for a period of 30 days, for a

T-Mobile cellular phone assigned telephone number (786) 878-9942, subscribed to Craig Drummond, 13499 Biscayne Boulevard, apartment #1113, North Miami, Florida, 33131, but believed to be used by JENSSI ASTACIO, a.k.a. Moreno, a.k.a. "J" (hereinafter identified as "ASTACIO"), with IMSI 310260458254060 (hereinafter, the "TARGET TELEPHONE").  The TARGET TELEPHONE is further described in Attachment A, and the location information to be seized is further described in Attachment B hereto.  Although the TARGET TELEPHONE is not subscribed in ASTACIO's name, voice identification of the user of the TARGET TELEPHONE confirms the user is ASTACIO.[1]

8. I am currently involved with the Investigative Agencies in a criminal investigation into the possession and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); the use of a communication facility, in violation of Title 21, United States Code, Section 843(b); maintaining drug-involved premises, in violation of Title 21, United States Code, Section 856; conspiracy to commit narcotics-trafficking offenses, in violation of Title 21, United States Code, Section 846; and money-laundering offenses, in violation of Title 18, United States Code, Section 1956 (collectively, the "Target Offenses"). JESUS GONZALEZ, CRAIG DRUMMOND, DARREN INFANTE, FREDDY NIVAR,

---

[1] Although TARGET TELEPHONE #2 is subscribed to DRUMMOND, agents believe it is actually used by ASTACIO.  On February 25, 2016, the Honorable Allison D. Burroughs, United States District Judge for the District of Massachusetts, signed an order authorizing Title III interception of wire and electronic communications over a telephone utilized by GONZALEZ.  On March 1, 2016, ASTACIO used that telephone to order takeout food from a restaurant in Miami (GONZALEZ was visited Miami at the time).  During the call, he spoke Spanish and informed the restaurant employee that his name was "Jenssi."  Throughout that and subsequent periods of interception of GONZALEZ's phone, GONZALEZ was intercepted on numerous occasions speaking with the user of the TARGET TELEPHONE.  In some of those calls, GONZALEZ greeted the user of the TARGET TELEPHONE as "J."  Voice comparison between the March 1, 2016 restaurant call and the intercepted calls with "J" reveal the calls to have been made by the same speaker.  In contrast, an English speaking male using telephone number (786) 859-6655 (which is also subscribed to DRUMMOND) has also been intercepted over GONZALEZ's telephone.  The user of (786) 859-6655 has a distinctively different voice than the user of the TARGET TELEPHONE.

JENSSI ASTACIO, OSNELY GUZMELY-ESQUIVEL, ALEX OVIEDO, JUAN URBAEZ, JUAN REYES, BENNY FERNANDEZ, GARRY GABIN, RYAN SINGH, JOHNNY URENA, JEFFREY BRATHWAITE, JOSEPH CORREA, MOSES RODRIGUEZ, CARLOS ARIAS, UM1113, and others known and unknown (the "Target Subjects"), are subjects of the investigation.

9. Based on the investigation to date, I believe that the TARGET TELEPHONE is being used by JENSSI ASTACIO to coordinate the receipt and distribution of controlled substances as well as to launder the proceeds from the sale of controlled substances. Information concerning the location of the TARGET TELEPHONE will allow agents to locate ASTACIO, conduct physical surveillance of GONZALEZ and his associates, allow agents to identify other criminal associates of ASTACIO, and perhaps seize contraband such as drugs or drug sale proceeds.

10. I submit this affidavit for the limited purpose of establishing probable cause for the requested warrant. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation.

## SUMMARY OF INVESTIGATION

11. In June of 2014, I identified a pattern of suspicious Priority Mail Express packages mailed from Miami, Florida to multiple addresses in Lawrence, Massachusetts. I know that Florida is a drug source state for the illicit trafficking of prescription medication and more specifically for Oxycodone. The packages weighed between one and three pounds, bore handwritten mailing labels and were addressed from an individual to an individual.

5

Additionally, the packages, in most instances, bore legitimate return addresses coupled with sender names that could not be associated with the return address. The packages bore addressee names that also could not be associated with the delivery address. All of these factors are consistent with characteristics of drug packages I have identified during my career.

12. Subsequent investigation revealed the packages were associated with a large scale oxycodone/Percocet drug trafficking organization (DTO) that used the U.S. Mail to ship pills from Miami to Massachusetts. The vast majority of the packages were mailed at the North Miami Post Office, which is equipped with a high definition video surveillance system. Between August 25, 2014 and the present, INFANTE, FERNANDEZ, ASTACIO, GONZALEZ, and DRUMMOND were all captured on video surveillance at the North Miami Post Office mailing suspicious packages. INFANTE, FERNANDEZ, and ASTACIO previously resided in Lawrence, Massachusetts, while GONZALEZ currently resides in Haverhill, Massachusetts. Review of video surveillance reveals that the majority of the packages have been mailed by DRUMMOND and ASTACIO. GONZALEZ mailed one package from Miami on March 9, 2015. In addition, records obtained from FedEx reveal that from April 23, 2015, to October 14, 2015, approximately twenty packages were shipped by the DTO from Miami to addresses associated with members of the DTO. GONZALEZ was also captured on bank video surveillance on eleven different dates between July 14, 2014, and February 10, 2015, making cash deposits to DRUMMOND's and INFANTE's bank accounts.

13. Two packages mailed by members of the DTO were searched, pursuant to federal search warrants, during the investigation. One package (mailed by INFANTE from the North Miami Post Office on October 29, 2014), was found to contain approximately 875 oxycodone pills. The second (mailed by DRUMMOND from the North Miami Post Office on April 17, 2015), was found to contain approximately 799 pills of oxycodone, and 175 pills of Alprazolam.

14.     On February 25, 2016, the Honorable Allison D. Burroughs, United States District Judge for the District of Massachusetts, signed an order authorizing Title III interception of wire and electronic communications over the telephone utilized by GONZALEZ. ASTACIO was intercepted on several occasions discussing narcotics transactions with GONZALEZ.

15.     Thereafter, on March 31, 2016, the Court authorized continued Title III interception of wire communications of the Target Subjects (and additional target subjects) over the telephone utilized by GONZALEZ, and on May 17, 2016, the Court authorized continued interception of wire communications of the Target Subjects (and additional Target Subjects) over GONZALEZ's telephone and initial interception of wire communications over telephone number (786) 878-9942, the TARGET TELEPHONE.

16.     Interception over GONZALEZ's telephone concluded on June 8, 2016, with the arrest of GONZALEZ on federal drug trafficking charges.

17.     Initial interception over ASTACIO's telephone concluded on June 16, 2016, and on August 31, 2016, and again on October 11, 2016, renewed interception of the TARGET TELEPHONE was authorized. Interception of the TARGET TELEPHONE pursuant to the October 11, 2016 Order commenced on October 12, 2016, and is ongoing. ASTACIO has been intercepted numerous times discussing the distribution of controlled substances.

18.     For example, on October 1, 2016, at approximately 12:00 noon, ASTACIO used the TARGET TELEPHONE to call REYES at (978) 376-5656. ASTACIO asked, "[a]ll set?" REYES replied, "[m]an, that has not arrived yet. I just checked and it says for Monday" (a package had not arrived yet, and was apparently scheduled to be delivered on Monday). ASTACIO said in an aside, "[w]hy it says for Monday, Craig?" (ASTACIO ask DRUMMOND ("Craig") why the package was scheduled for delivery on Monday, October 3rd.) DRUMMOND could be heard in the background saying, "[f]or Monday?" (DRUMMOND

asked for clarification.) ASTACIO replied in an aside, "[y]eah, man, a, what time sent it?") (ASTACIO confirmed the delivery was apparently scheduled for Monday, and asked what time DRUMMOND had sent the package.) DRUMMOND could be heard in the background saying, "[a]round 9:45 something like that." ASTACIO replied, "[d]amn, hold on," and hung up on REYES.

19.    Approximately one minute, at approximately 12:01 p.m., ASTACIO called REYES again over the TARGET TELEPHONE. In an aside, ASTACIO was heard telling someone (believed to be DRUMMOND) "[y]ou were supposed to be there by 12:00 not 10:30." ASTACIO then said to REYES, "[n]o, because he was supposed to be there by 12, so you still have, you know it wasn't 10:30" (ASTACIO told REYES the package was supposed to be delivered by 12, not by 10:30). REYES said, "OK, let me check again." A few minutes later, at approximately 12;03 p.m., ASTACIO called REYES again. ASTACIO said, "I'm call it in. … Unless, can you pick it up when you get with him?" (ASTACIO asked if REYES could pick the package up when he met up with an unidentified individual.) REYES replied, "[u]m, damn, depends upon what time they close. I am working still" (REYES was not sure whether he could pick up the package because he was still at work). ASTACIO replied, "[U/I] destination they close at 3:30. I mean you can go and pick it up yourself" (ASTACIO said the delivery company closed at 3:30 but REYES could go to the company to pick up the package). REYES said, "[l]et me see if I can go, yeah. … Where is that at? In Londonderry?" (REYES would try to pick it up, and asked for confirmation that the delivery company was located in Londonderry (New Hampshire).) ASTACIO replied, "[y]eah. I got the address I will get the address if you want. I mean it says the address right there." REYES said, "OK, let me see."

20.    At approximately 1:49 p.m. that afternoon, ASTACIO used the TARGET TELEPHONE to call FedEx. ASTACIO said, "[y]eah, I am calling you about a package that

8

was sent yesterday, and it was supposed to be there by 12.  And it says it will be delivered on Monday.  Like, I don't understand why I pay for it, to get there today and is still not there."  An unidentified male FedEx representative replied, "I am, apologize about that, I will take a look and see what is going on here, OK?  May I have your name sir?"  ASTACIO replied, "Daniel."  The FedEx representative said, "[a]lright, do you have a tracking number so I can pull this thing up?"  ASTACIO replied, "[y]es, I do.  7842-3437-8630" (ASTACIO (having identified himself as "Daniel") provided the tracking number for the package to the FedEx representative).  The FedEx representative replied, "[a]lright, I pulled it here, I need you to verify either the shipping address or the receiving address."  ASTACIO said, "[w]hat do you mean?  The address where it is going or where it is coming?"  The FedEx representative said, "[e]ither."  ASTACIO said, "19, hold on, I will give you an address right now.  It is my house address, 142 Saratoga Street, [U/I], 2nd Floor" (relatives of REYES live at that address).  The FedEx representative explained that the package had been addressed to the wrong zip code and the telephone number provided for the package had not accepted incoming calls, so the package had been sent to the FedEx facility rather than delivered.  ASTACIO asked, "[s]o can I just have somebody to pick it up at the facility?"  The FedEx representative said yes, and ASTACIO said he wanted his money back and complained about FedEx's level of service.  The FedEx representative asked if ASTACIO had paid with a credit card, and ASTACIO said he did not care about the money.  The FedEx representative said, "[t]he address to pick up is 10 Industrial Drive, Londonderry, NH, 03053."  ASTACIO apologized for his attitude and the call ended.

21.     Almost immediately after, at approximately 1:54 p.m., ASTACIO used the TARGET TELEPHONE to call REYES.  REYES said, "[y]o, send Stack to pick it up" (REYES told ASTACIO to have URENA pick up the package from FedEx).  ASTACIO said, "I just shitted on them, nigga" (ASTACIO had just called FedEx to complain).  REYES asked, "[y]ou

9

called them?" ASTACIO replied, "I fucking, next time we got to put the phone number in here. That is what fucked us over. He said that he was calling him when he was outside" (on future packages they would need to include a good telephone number, because this time when FedEx called they had been unable to reach anyone). REYES said, "there's a number" (REYES protested that they had provided a telephone number). ASTACIO said, "[t]hank God we put the signature shit because he was like 'I was going to leave it outside when I see the signature' nigga, thanks God we put that on, or it could have been stolen" (ASTACIO was relieved they had sent the package with signature required, because otherwise the package would have been left at the house and might have been stolen). REYES said, "[U/I] pick him up and he will go" (REYES would ensure URENA went to retrieve the package from FedEx).

      22.     A few minutes later, at approximately 1:55 p.m., ASTACIO called URENA over the TARGET TELEPHONE and said, "[y]o, listen, when you pick that up [U/I] my name, no under [U/I] one more thing, you think that that dicksucker man, the package is at Saratoga. Have you ever been in Saratoga Street?" (ASTACIO instructed URENA to take an unidentified male to pick up the package, and not to use ASTACIO's name). URENA said, "I know where he lives." ASTACIO said, "[a]t Saratoga, so go to Saratoga, pick him up and take him, that dicksucker to pick it up, but we only got until 3 or 3:30" (URENA was to pick up the UM at Saratoga Street but had to hurry because the FedEx office closed at 3 p.m. or 3:30 p.m.). URENA asked, "[a]nd where is that?" ASTACIO replied, "[i]n New Hampshire. He knows where it is that dicksucker. And don't pay him" (the UM knew the location of the FedEx office in New Hampshire; URENA was not to pay the UM).

      23.     At approximately 2:00 p.m. that afternoon, URENA called ASTACIO at the TARGET TELEPHONE. During the call, ASTACIO said, "[U/I] fuck nigga, it was fucking Craig that put the incorrect fucking zip code" (DRUMMOND had listed the wrong zip code for

10

the recipient address on the package).  URENA said, "[d]amn, tell him that you cannot be play around with that shit" (URENA told ASTACIO to tell DRUMMOND to be more careful).

24. Based upon these intercepted communications, investigators believe ASTACIO had DRUMMOND send a package containing controlled substances to REYES via FedEx.

**AUTHORIZATION REQUEST**

25. Based on the foregoing, there is probable cause to believe that the Target Subjects are committing one or more of the Target Offenses, that the TARGET TELEPHONE is continuing to be used by ASTACIO or another Target Subject, and that the Requested Information will lead to evidence regarding the Target Offenses as well as the location of the TARGET TELEPHONE.  Based on the foregoing, I believe the Requested Information is necessary to determine the location of the TARGET TELEPHONE so that law enforcement agents can conduct physical surveillance of the user(s) of the TARGET TELEPHONE and identify other potential participants in an ongoing conspiracy to distribute quantities of controlled substances.

26. WHEREFORE, pursuant to the Federal Rules of Criminal Procedure Title 41 and 18 U.S.C. §2703(c)(1)(A), it is requested that the Court issue a warrant authorizing agents of the Investigative Agencies to continue to obtain the Requested Information for a period of 30 days, with said authority to extend to any time of the day or night as required, including when the TARGET TELEPHONE leaves the District of Massachusetts.

27. The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. §2510).  To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. 2703(c)(1)(A).

28. IT IS FURTHER REQUESTED that the Court direct T-Mobile to assist the

Investigative Agencies by providing all information, facilities and technical assistance needed to ascertain the requested information, and further direct T-Mobile, the service provider for the TARGET TELEPHONE to initiate a signal to determine the location of the TARGET TELEPHONE on the service providers network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user of the TARGET TELEPHONE for a period of 30 days, unless extended by the Court. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

29. IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

30. IT IS FURTHER REQUESTED that the Order apply to any changed telephone number subsequently assigned to the instrument bearing the same IMSI as the TARGET TELEPHONE, and to any changed IMSI bearing the telephone number of TARGET TELEPHONE, within the period of the Courts Order.

31. There is reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result, 18 U.S.C. §3103a(b)(1). Providing notice to the subscriber or user(s) of the TARGET TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give ASTACIO and/or his co-conspirators an opportunity to destroy evidence, change patterns of behavior, notify confederates, and/or flee or continue flight from prosecution. It is accordingly further requested that the warrant, this Affidavit, and all other documents relating to this application and the Court's Orders thereon, as

they reveal an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on the Investigative Agencies as well as other investigative and law enforcement officers.

32. IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of thirty days after the termination of the monitoring period authorized by the warrant or any extensions thereof.

_____
Stephen Dowd
U.S. Postal Inspector

Subscribed and sworn before me,
this **Oct 20, 2016** day of October, 2016

_____
HONORABLE JUDITH G. DEIN
United States Magistrate Judge

13

## ATTACHMENT A

Information about the location of the mobile phone assigned call number (786) 878-9942 and accessed through IMSI 310260458254060 (the "TARGET TELEPHONE"), whose service provider is T-Mobile.

## ATTACHMENT B

All information about the location of the TARGET TELEPHONE described in Attachment A for a period of thirty days, during all times of day and night, including:

1. E-911 Phase II data;

2. GPS data;

3. latitude-longitude data;

4. other precise location information;

5. data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the TARGET TELEPHONE; and

This warrant does not authorize the collection of any content of any communications.

T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the TARGET TELEPHONE unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Telephone on T-Mobile's network, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of Information about the location of the TARGET TELEPHONE. *See* 18 U.S.C. § 3103a(b)(2).

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or to any other person, unless and until otherwise authorized to do so by the Court. *See* 18 U.S.C. § 2705(b).